<table>
<tr><td>

PETE RYAN, JEFFREY RAY and
ANDRE FREEMAN, on behalf of
themselves and others similarly situated,

                   Plaintiffs,

     v.

FLOWERS FOODS, INC. and
FLOWERS BAKING CO. OF VILLA
RICA, LLC,

                Defendants.

</td><td>

Civil Case No.:

**CLASS AND COLLECTIVE
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

</td></tr>
</table>

Plaintiffs Pete Ryan, Jeffrey Ray and Andre Freeman (collectively "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their attorneys, hereby allege the following against Flowers Foods, Inc. ("Flowers Inc.") and Flowers Baking Co. of Villa Rica, LLC ("Flowers Villa Rica" and together with Flowers Inc., referred to as "Flowers" or "Defendants"):

## INTRODUCTION

1. This class and collective action, brought by Plaintiffs on behalf of themselves and a class of current and former drivers employed by Flowers as distributors, challenges Defendants practices and policies of misclassifying Plaintiffs as independent contractors, and not paying them overtime compensation

1

and other benefits of employment in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* and the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 *et. seq.*

2.     While Flowers classifies Plaintiffs, and other similarly situated distributors as independent contractors, Flowers exerts considerable control over every aspect of their work. Plaintiffs have virtually no discretion in the operation of their purported "business" and have no authority to make decisions that affect their ability to increase profits.

3.     With no organic growth in the bread industry, Flowers maintains its expanding margins by intentionally misclassifying its distributors in order to avoid paying them overtime compensation as they work approximately 70-80 hours per week.

**<u>PARTIES</u>**

4.     Plaintiff Pete Ryan is a resident of the state of Georgia who was employed by Defendants as a Georgia distributor during the statutory period covered by this Complaint. Defendants misclassified Mr. Ryan as an independent contractor and did not pay him overtime and other benefits of employment.

5.     Plaintiff Jeffrey Ray is a resident of the state of Georgia who was employed by Defendants as a Georgia distributor during the statutory period covered

by this Complaint. Defendants misclassified Mr. Ray as an independent contractor and did not pay him overtime and other benefits of employment.

6. Plaintiff Andre Freeman is a resident of the state of Georgia who was employed by Defendants as a Georgia distributor during the statutory period covered by this Complaint. Defendants misclassified Mr. Freeman as an independent contractor and did not pay him overtime and other benefits of employment.

7. Defendant Flowers Inc. is a Georgia corporation with its principal place of business at 1919 Flowers Circle, Thomasville, Georgia, 31757.

8. Flowers Inc. opened its first bakery in 1919, and today is one of the largest producers of packaged bakery foods in the United States. Flowers Inc. hires individuals through its various subsidiaries to distribute its products by delivering them to grocery stores and stocking the products on store shelves. Flowers Inc. employs distributors in 31 states throughout the southern and eastern parts of the United States.

9. Defendant Flowers Villa Rica is a wholly owned subsidiary of Flowers Inc. and is a Georgia limited liability company with its principal place of business at 1919 Flowers Circle, Thomasville, Georgia, 31757.

10. At all relevant times hereto, Flowers Inc. and Flowers Villa Rica were employers of Plaintiffs, within the meaning of the FLSA.

11.     At all relevant times hereto, Plaintiffs were employees of Flowers, within the meaning of the FLSA.

12.     At all relevant times hereto, Flowers was an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the FLSA.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction.

14.     Venue is proper in this Court under 28 U.S.C §§ 1391(b)(2) and 1391(c) because a substantial part of the events giving rise to the claim occurred in this district, and Defendants and Plaintiffs are subject to personal jurisdiction in this district.

15.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTS

16.     Flowers manufactures, sells, and distributes bakery and snack food products to retail customers, primarily grocery stores, mass retailers, and fast food chains through its warehouse facilities and its centralized Direct-Store-Delivery ("DSD") network.

17.    Flowers' top ten customers account for 46.8% of its total sales.[1]

18.    Distributors deliver Flowers products almost exclusively to these large customers, as well as mass retailers and chain stores.

19.    Flowers exerts practically exclusive control over every aspect of the distribution of Flowers' products to these customers.

20.    Flowers negotiates directly with retailers, chain stores, and other customers to set virtually every term of their relationship, including the price of the products, loss absorption of products not sold, product selection, payment method for the products delivery schedules, and display specifications for the products.

21.    Flowers employs Plaintiffs and other similarly situated distributors to deliver the products in accordance with the specific terms already negotiated by Flowers.

22.    Distributors do not exercise managerial skills or business judgment to affect their profits or losses.

23.    Moreover, the work performed by distributors does not require any special skills or initiative.

---

[1] *See* Flowers Foods Inc. Annual Report, filed on Form 10K with the United State Securities and Exchange Commission on February 23, 2017 ("Flowers 10K").

24.     Distributors must deliver these products at the time and place dictated by Flowers and at the price specified by Flowers.  No deviation is permitted.

25.     Often times while distributors are out on their delivery routes, they will receive calls from Flowers directing them to make unscheduled deliveries to Flowers' customers.  Distributors are required to obey such orders, even if such deliveries are not profitable and are out of the way.  Refusal to make these deliveries is grounds for discipline and termination.

26.     In addition to delivering Defendants' products to Defendants' customers, distributors must stock the products on the store shelves in accordance with the specific instructions and diagrams, referred to as "Planograms," that are provided by Flowers.  No deviation is permitted.

27.     Distributors are closely monitored and supervised by Sales Managers who ensure that distributors comply with the terms that were negotiated between Flowers and its customers.

28.     Sales Managers also conduct regular "spot checks" to confirm that distributors strictly adhere to the Planograms and discipline distributors for any deviation.

29.     Distributors are also required to remove stale and unsold products in accordance with a schedule that is established by Flowers.  No deviation is permitted.

30.     Distributors return the unsold products to Flowers, who then either discards them or resells them to thrift shops, at its own discretion.  Distributors have no input on these decisions.

31.     Distributors use Flowers' hand-held computer to log and track their deliveries and pick-ups.  The computers capture data that distributors report back to Defendants when they turn in their computers at the warehouse at the end of the workday.

32.     Flowers uses this data to bill their customers, without any input from the distributors.

33.     Distributors do not negotiate with any retailers or chain stores and do not solicit such new customers.  All such activities are done solely by Flowers.

34.     Besides delivering Flowers' products and removing stale unused products, distributors have virtually no other dealings with Flowers' customers.

35.     Distributors are not permitted to use any business judgment or discretion to refuse the promotional products (or any additional products) that Flowers had allocated to be delivered to any given customer.  If a product is refused, distributors will be charged the full price of that product, as if it was delivered to and paid for by the customer.

36.     Furthermore, distributors are not permitted to use any business judgment or discretion to alter their routes, to refuse delivery to certain customers (even if such deliveries are not profitable or are out of the way for the distributors), or to choose whether to service an account (even one that generates a loss).  Any such deviation or refusal leads to discipline and termination.

37.     Distributors are not even permitted to handle customer complaints; all such complaints are directed solely to Flowers.

38.     Because of the significant level of control Flowers routinely exerts over their work, distributors are not offered an opportunity to exercise any discretion or managerial skills to generate profits.

39.     Accordingly, it is not surprising that Flowers requires little to no experience and no special skills, let alone managerial skills or initiative, for drivers to become Flowers distributors.

40.     As stated on the website of a route broker, specifically selling Flowers' routes: "Since only 1 of 5 buyers who purchase a route from us has had previous route experience, little or no knowledge of routes is usually necessary to be successful."[2]

41.     Distributors' investment is relatively low compared to that of Flowers.

---

[2] http://www.mrroutecarolinas.com/route-faq/ (last visited on March 6, 2017).

42.     Distributors are required to purchase their routes from Flowers. However, as detailed in Flowers' SEC filings, a majority of these routes are sold to the distributors under long-term financing arrangements whereby the distributors pay nothing up front for the route and Flowers finances them with a note for up to ten years and charges them approximately 12% interest.    This money is automatically deducted from the distributors' paychecks.

43.     Distributors are also required to obtain a small delivery truck, often through a lease arranged by Flowers.  Flowers also arranges the insurance that it requires all distributors to carry.

44.     Again, distributors are not required to pay anything up front; the money for the lease and the insurance is automatically deducted from their paychecks.

45.     Moreover, distributors face no risk of loss since Flowers has a policy of buying back the route and the leased truck once a distributors' relationship with Flowers is terminated.

46.     Relative to Flowers, distributors have little to no investment and face no risk.  As distributor Rene Penate stated on Flowers' corporate website: "All you

have to do is save enough money to get a truck and two weeks later you start making money."[3]

47.     Distributors are integral to Flowers' business.

48.     In 2016, 84% of Defendants' total sales were generated by distributions of Flowers' products through its DSD network using distributors, such as Plaintiffs, which reached approximately 85% of the Unites States population.[4]

49.     This "independent operator distribution model" is central to what Flowers boasts as "The Flowers Way" and is the cornerstone of its business strategy.

50.     Indeed, intentionally misclassifying distributors as independent contractors and requiring them to work 70-80 hours per week without overtime compensation is how Flowers is able to maintain its expanding margins despite a lack of any organic growth in the industry.

51.     Flowers enters into distributor agreements with Plaintiffs and other distributors which have no specific end dates and could be terminated by either party at any time with limited notice.

52.     Distributors have no ability to negotiate the terms of the distributor agreement and must accept all terms as a condition of employment.

---

[3] https://www.flowersfoods.com/IDprogram/index.cfm (last visited March 6, 2017).
[4] *See* Flowers 10K.

53. While the distributor agreement labels distributors as independent contractors, Flowers has substantial and overwhelming control over the distributors and every aspect that affects their ability to make money.

54. Plaintiffs, like all other similarly situated distributors, work 70-80 hours per week for Flowers, making it impossible for them to provide their services to other employers. Moreover, the agreement limits the distributors' ability to carry competitive products and work for other entities.

55. For example, the distributor agreement precludes distributors from carrying outside merchandize that is "competitive" with the Flowers' products.

56. Distributors are not even permitted to hire someone to assist them with their work without the prior written approval of Flowers.

57. Distributors are also required to comply with Defendants' dress code, or be subjected to discipline.

58. Based on the contract, any deviation or failure to comply with the dress code, the delivery specifications or any other terms dictating the distributors' work (most of which are negotiated by Flowers and its customers with no input from the distributors), amounts to a breach of the "good industry practice" provision of contract which is grounds for termination.

59.     Not surprisingly, Flowers employs full-time employees who regularly perform the same work as the distributors.  These employees service the routes when the distributors are unavailable.

60.     Flowers sometimes holds "sales contests" for the distributors and awards vacation days to the winners.  On such days, the routes are serviced by the full-time employees who perform identical work as that of the distributors.

61.     Moreover, the distributor agreements also state that the distributors are deemed "statutory employees" under Section 3121 of the Internal Revenue Service ("IRS"), for purposes of paying federal and state employment taxes.

62.     Despite the considerable control Flowers exerts over the distributors, it uniformly misclassifies them as independent contractors, in order to avoid paying them overtime compensation.

63.     However, the distributors are not independent contractors; they are Flowers' employees and are entitled to overtime compensation as required by the FLSA.

64.     On its career website, Flowers touts its lucrative employment benefits as well as its 401K plan.[5]

---

[5] https://careers.flowersfoods.com/content/benefits/  (last visited March 6, 2017).

65.     Upon information and belief, and at all relevant times, Defendants mischaracterized Plaintiffs as independent contractors instead of employees to avoid the significant financial costs of providing them with employment benefits, including a 401K plan, and misled Plaintiffs into believing that Defendants could exclude them from participation in such plans.

66.     Defendants maintain valuable employee benefit plans, including a 401K plan, which are available to persons who are classified as company employees and who work a specified number of hours for particular periods of time, as required under the respective benefit plans' agreements and programs.

67.     Plaintiffs, and all other similarly situated distributors, have been wrongfully excluded from participating in Defendants' employee benefit and 401K programs due to Defendants' wrongful misclassification of them as independent contractors, and interfering with their attainment of ERISA rights under the respective plans.

68.     Plaintiffs, and all other similarly situated distributors, were in fact employees of Defendants, and therefore were entitled to participate in Defendants' employee benefit and 401K plans, to the extent that the plans did not otherwise expressly or permissibly exclude persons in their position, and so long as they met other eligibility requirements specified in each benefit plan.

69.     Plaintiffs, and all other similarly situated distributors, have been injured and damaged by Defendants' wrongful exclusion of them from participating in these ERISA employee benefit plans.

**Mr. Pete Ryan**

70.     Mr. Ryan worked approximately 70 to 80 hours per week servicing all Defendants' assigned stores on his route.

71.     Mr. Ryan never received overtime compensation for any time worked in excess of 40 hours in one work week.

72.     Mr. Ryan's delivery schedule and specifications were set by Flowers.

73.     Like other similarly situated distributors, Mr. Ryan began his typical day by arriving at his designated Flowers warehouse (in Woodstock, GA), picking up his Flowers delivery truck, a small hand-held computer (provided by Flowers), the Planograms (prepared by Flowers), and the products (prepared by Flowers) which he was required to deliver at the time and place, and in the manner and price all dictated by Flowers, without deviation.

74.     Mr. Ryan loaded the Flowers products into the delivery trucks, in the manner specified by Flowers, using the Flowers delivery trays (provided by Flowers).

75.     Mr. Ryan's Sales Managers typically monitored his work to ensure compliance with "The Flowers Way."

76.     Mr. Ryan was not permitted to refuse any promotional products (or any additional products) that Flowers had allocated for delivery. Any refusals resulted in the full price of the product being deducted from his paycheck.

77.     Mr. Ryan was likewise not permitted to alter his delivery route or refuse delivery to certain customers, even if such deliveries were not profitable or out of the way.

78.     While Mr. Ryan was out making deliveries, Flowers would occasionally call him and demand that he divert from his current delivery route to make additional and unscheduled deliveries. Mr. Ryan was required to obey such orders even if they resulted in him losing money.

79.     Upon delivery of the Flowers products to the Flowers customers, Mr. Ryan would stock the shelves in strict adherence to the detailed Planogram prepared by Flowers.

80.     Mr. Ryan's Sales Managers would periodically conduct "spot checks" to confirm that the Planograms and all other delivery specifications were complied with. Any deviation was grounds for discipline and termination.

81.     Mr. Ryan was not even permitted to handle customer complaints; all complaints had to be directed to Flowers.

82.     Mr. Ryan was also required to remove unsold and stale products in accordance with a schedule agreed to between Flowers and its customers.

83.     Mr. Ryan returned the unused and stale products back to Flowers.

84.     Mr. Ryan used Flowers' hand-held computers to track and log deliveries and pick-ups and he returned the computer to Flowers at the end of his workday.

85.     Flowers used this data to bill their customers, with no input from Mr. Ryan.

86.     When Mr. Ryan was unavailable or when he won a contest and received a "vacation from service" day, Flowers used its full-time employees to service Mr. Ryan's route and perform virtually identical work to what Mr. Ryan had done.

87.     Because of the overwhelming control Flowers exerted over its distributors, Mr. Ryan was not able to exercise any independent business judgment, managerial skills or initiative to increase his profits.

88.     Mr. Ryan was not permitted to carry or deliver outside merchandize that was "competitive" with the Flowers' products.

89.     Mr. Ryan's Sales Managers enforced Flowers' dress code, which Mr. Ryan was required to comply with.

90.     Pursuant to his distributor agreement, Flowers classified Mr. Ryan as a "statutory employee" under the IRS for purposes of paying federal and state employment taxes.

91.     Mr. Ryan had no prior experience as a distributor or route driver.

92.     Mr. Ryan was not able to negotiate the terms of his distributor agreement with Flowers; he accepted all terms as a condition of employment.

93.     Mr. Ryan did not make any significant investment, especially relative to Flowers.

94.     Mr. Ryan purchased his route from Flowers under a long term financing agreement, whereby he paid nothing up front and Flowers financed the purchase with a 10 year note and charged him 12% interest.  The money was automatically deducted from Mr. Ryan's paycheck.

95.     Mr. Ryan leased his delivery truck through a lease arranged by Flowers.

96.     Flowers also set up the insurance that it required for the delivery truck.

97.     Payments for the lease and insurance were deducted automatically from Mr. Ryan's paycheck.

98.     Mr. Ryan faced no risk of loss.

99. Upon the termination of his relationship with Flowers, Flowers purchased back his route and assumed the lease on the delivery truck.

100. Flowers improperly misclassified Mr. Ryan as an independent contractor and excluded him from Flowers' lucrative employment benefits and 401K plan.

**Mr. Jeffrey Ray**

101. Mr. Ray worked approximately 70 to 80 hours per week servicing all Defendants' assigned stores on his route.

102. Mr. Ray never received overtime compensation for any time worked in excess of 40 hours in one work week.

103. Mr. Ray's delivery schedule and specifications were set by Flowers.

104. Mr. Ray started his typical day by picking up Flowers' products from the warehouse (also located in Woodstock, GA) as well as the small hand-held computer (provided by Flowers).

105. Mr. Ray loaded the Flowers products into the delivery truck, in a manner specified by Flowers, even using the Flowers delivery trays (provided by Flowers).

106. Mr. Ray's Sales Managers typically supervised his work to ensure that it complied with Flowers' policies and standards.

107. The Sales Managers also enforced Flowers' dress code, which Mr. Ray was required to comply with.

108. Mr. Ray was then required to deliver the Flowers products to Flowers' customers at the time and place, and in the manner and price all dictated by Flowers, without deviation.

109. Mr. Ray was not permitted to refuse any promotional products (or any additional products) that Flowers had allocated for delivery. Any refusals resulted in the full price of the product being deducted from his paycheck.

110. Mr. Ray was not permitted to alter his delivery route or refuse to delivery to certain customers, even if such deliveries were not profitable or out of the way.

111. While making deliveries, Mr. Ray was occasionally contacted by Flowers and requested to make additional unscheduled deliveries. Mr. Ray was required to obey such orders even if they were not profitable or out of the way.

112. Upon delivery, Mr. Ray would stock the products on store shelves in strict adherence to the Planograms that were prepared by Flowers.

113. Mr. Ray's Sales Managers would perform periodic "spot checks" to ensure compliance with delivery specifications and Planograms.

114.   Based on a schedule agreed to between Flowers and its customers, Mr. Ray removed unused or stale products and returned them back to Flowers.

115.   Mr. Ray used a small hand-held computer that tracked and logged deliveries and pick-ups and he returned the computer to Flowers at the end of his workday.

116.   Flowers used this data to bill their customers, with no input from Mr. Ray.

117.   When Mr. Ray was unavailable for work, Flowers used its full-time employees to service Mr. Ray's route.   These employees performed virtually identical work to what Mr. Ray had done.

118.   Because of the considerable control that Flowers exerted over his work, Mr. Ray was not permitted to exercise any business discretion, managerial skills or initiative to affect his profits.

119.   Mr. Ray was not even permitted to handle customer complaints and was required to direct all customer issues to Flowers.

120.   Mr. Ray made no significant investment and faced no risk of loss.

121.   Mr. Ray purchased his route from Flowers under a long term financing agreement, whereby he paid nothing up front and Flowers financed the purchase

with a 10 year note and charged him 12% interest. The money was automatically deducted from his paycheck.

122.    Upon the termination of his relationship with Flowers, Defendants purchased back his route.

123.    Mr. Ray was not permitted to negotiate any terms of the distributor agreement and had to accept all terms as a condition of employment.

124.    Pursuant to his distributor agreement, Flowers classified Mr. Ray as a "statutory employee" under the IRS for purposes of paying federal and state employment taxes.

125.    Flowers improperly misclassified Mr. Ray as an independent contractor and excluded him from Flowers' lucrative employment benefits and 401K plan.

**Mr. Andre Freeman**

126.    Mr. Freeman worked approximately 70 to 80 hours per week servicing all Defendants' assigned stores on his route.

127.    Mr. Freeman never received overtime compensation for any time worked in excess of 40 hours in one work week.

128.    Mr. Freeman's delivery schedule and specifications were set by Flowers.

129.   Mr. Freeman started his typical day by picking up Flowers' products as well as the small hand-held computer, provided by Flowers, from the warehouse (located in Woodstock, GA)

130.   Mr. Freeman loaded the Flowers products into the delivery truck, in a manner specified by Flowers, even using the Flowers delivery trays (provided by Flowers).

131.   Mr. Freeman's Sales Managers typically enforced Flowers' dress code and supervised Mr. Freeman's work, to ensure that it complied with Flowers' policies and standards.

132.   Mr. Freeman was required to deliver the Flowers products to Flowers' customers at the time and place, and in the manner and price all dictated by Flowers, without deviation.

133.   Mr. Freeman was not permitted to refuse any promotional products (or any additional products) that Flowers had allocated for delivery.  Any refusals resulted in the full price of the product being deducted from his paycheck.

134.   Mr. Freeman was not permitted to alter his delivery route or refuse to delivery to certain customers, even if such deliveries were not profitable or out of the way.

135.   While making deliveries, Mr. Freeman was occasionally contacted by Flowers and requested to make additional unscheduled deliveries.  Mr. Freeman was required to obey, and did obey, such orders even when they were not profitable or out of the way.

136.   Upon delivery, Mr. Freeman stocked the products on store shelves in strict adherence to the Planograms that were prepared by Flowers.

137.   Mr. Freeman's Sales Managers performed periodic "spot checks" to ensure compliance with delivery specifications and Planograms.

138.   Based on a schedule agreed to between Flowers and its customers, Mr. Freeman removed unused or stale products and returned them to Flowers, who either discarded or resold the products to thrift stores at its own discretion – without any input from Mr. Freeman.

139.   Mr. Freeman used a small hand-held computer that tracked and logged deliveries and pick-ups and he returned the computer to Flowers at the end of his workday.

140.   Flowers used this data to bill their customers, with no input from Mr. Freeman.

141.   When Mr. Freeman was unavailable for work, Flowers used its full-time employees to service Mr. Freeman's route.   These employees performed virtually identical work to what Mr. Freeman had done.

142.   Because of the considerable control that Flowers exerted over his work, Mr. Freeman was not permitted to exercise any business discretion, managerial skills or initiative to affect his profits.

143.   Mr. Freeman was not permitted to handle customer complaints; all such issues were direct to Flowers.

144.   Mr. Freeman made no significant investment and faced no risk of loss.

145.   Mr. Freeman purchased his route from Flowers under a long term financing agreement, whereby he paid nothing up front and Flowers financed the purchase with a 10 year note and charged him 12% interest.   The money was automatically deducted from his paycheck.

146.   Upon the termination of his relationship with Flowers, Defendants purchased back his route.

147.   Mr. Freeman was not permitted to negotiate any terms of the distributor agreement and had to accept all terms as a condition of employment.

148.   Pursuant to his distributor agreement, Flowers classified Mr. Freeman as a "statutory employee" under the IRS for purposes of paying federal and state employment taxes.

149.   Flowers improperly misclassified Mr. Freeman as an independent contractor and excluded him from Flowers' lucrative employment benefits and 401K plan.

## COLLECTIVE ACTION ALLEGATIONS

150.   Plaintiffs bring this action as a collective action to recover unpaid wages, including unpaid overtime compensation, pursuant to the FLSA, 29 U.S.C. §§ 207 and 216(b), on behalf of a class of current and former distributors employed by Defendants during the statutory period covered by this Complaint.

151.   Plaintiffs bring this suit on behalf of the following similarly situated persons:

> All current and former distributors who have worked for Defendants within the State of Georgia during the statutory period covered by this Complaint, and elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b) ("Collective Class").

152.   Plaintiffs allege on behalf of the Collective Class that they are: (i) entitled to unpaid overtime wages from Defendants for all time worked in excess of

40 hours in one work week, as required by law; and (ii) entitled to liquidated damages pursuant to the FLSA, 29 U.S.C. § 201, *et seq.*

153.   The claims under the FLSA may be pursued by those who opt-in to this case pursuant to 29 U.S.C. § 216(b).

154.   Defendants have engaged in a continuing and willful violation of the FLSA.

155.   There are numerous similarly situated current and former distributors employed by Defendants who have worked over 40 hours a week without appropriate overtime pay, in violation of the FLSA.  These distributors have all been intentionally misclassified as independent contractors.  These distributors all have similar, if not identical, job responsibilities.  They arrive at their designated warehouses to pick up the products, they load those products onto the delivery trucks, they follow a predetermined route to deliver products to customers, they offload those products, they stock shelves pursuant to Defendants' Planograms, they take stale or unsold products from customers, they log all of these activities on Flowers' hand-held computers, and they return to the warehouse when they are done with their routes where they turn in the computers for Flowers to review the data and bill the customers.

156.   These similarly situated current and former distributors would benefit greatly from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join in the lawsuit pursuant to 28 U.S.C. § 216(b).   These similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.   As such, notice should be sent to past and present distributors of Defendants.

## CLASS ACTION ALLEGATIONS

157.   Plaintiffs bring this action as a class action to recover benefits under Defendants' 401K plan pursuant to ESIRA, 29 U.S.C. § 1132, et. seq., on behalf of a class of current and former distributors employed by Defendants during the statutory period covered by this Complaint.

158.   Plaintiffs bring this class action on behalf of the following similarly situated persons:

> All current and former distributors who have worked for Defendants within the State of Georgia during the statutory period covered by this Complaint. ("ERISA Class").

159.   Plaintiffs allege on behalf of the ERISA Class that they are: entitled to unpaid benefits under Defendants' 401K plan, pursuant to Section 502(a)(1)(b) of ERISA, 29 U.S.C. § 1132, *et. seq.*

160.   The claims brought by Plaintiffs on behalf of the ERISA Class may be pursued by all similarly situated persons who do not opt out of the ERISA Class pursuant to Fed. R. Civ. P. 23.

161.   The members of the ERISA Class are so numerous that joinder of all members is impracticable.  While the exact number of the members of the ERISA Class is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds of individuals in the ERISA Class.

162.   Common questions of law and fact, the answers to which will advance this litigation, exist as to the ERISA Class and predominate over any questions only affecting them individually.  Indeed, there are few if any purely individual issues in this case.  The questions of law and fact that are common to Plaintiffs and all members of the ERISA Class include, but are not limited to, the following:

    a.  Whether Defendants misclassified Plaintiffs and members of the ERISA Class as independent contractors, rather than employees;

    b.  Whether Plaintiffs and members of the ERISA Class are entitled Defendants' 401K plan and other benefits extended to employees; and

    c.  Whether Defendants improperly withheld 401K benefits from Plaintiffs and members of the ERISA Class, in violation of the law.

163. Plaintiffs' claims are typical of the claims of the members of the ERISA Class they seek to represent. Plaintiffs and the members of the ERISA Class work, or have worked, for Defendants as distributors and are, or were, subject to the same compensation policies and practices, including classifications as independent contractors and exclusions from Defendants' lucrative 401K plan.

164. Plaintiffs will fairly and adequately protect the interests of the ERISA Class as their interests are in alignment with those of the members of the ERISA Class. Plaintiffs have no interests adverse to the class they seeks to represent, and have retained competent and experienced counsel

165. Defendants have acted or have refused to act on grounds generally applicable to the ERISA Class, thereby making final injunctive relief or corresponding declaratory relief with respect to the ERISA Class as a whole appropriate.

166. The class action mechanism is superior to other available methods for a fair and efficient adjudication of the controversy. Common issues of law and fact predominate over any individual issues. The damages suffered by individual members of the ERISA Class may be relatively small when compared to the expense and burden of litigation, making it virtually impossible for members of the ERISA Class to individually seek redress for the wrongs done to them.

167. The Collective Class and the ERISA Class are hereafter together referred to as the "Classes."

## FIRST CLAIM FOR RELIEF
## FAIR LABOR STANDARDS ACT OVERTIME VIOLATIONS
### (On Behalf of the Collective Class)

168. Plaintiffs, on behalf of themselves and the Collective Class, re-allege and incorporate by reference the paragraphs above as if they were set forth again herein.

169. At all relevant times, Defendants have had gross revenues in excess of $500,000.

170. At all relevant times, Defendants have been and continue to be, an employer engaged in interstate commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

171. At all relevant times, Defendants have employed, and/or continue to employ, Plaintiffs and each of the Collective Class members within the meaning of the FLSA.

172. At all relevant times, Defendants have had a willful policy and practice of misclassifying Plaintiffs and similarly situated distributors as "independent contractors" in order to avoid paying them appropriate overtime compensation for all hours worked in excess of 40 hours per work week.

173. As a result of the Defendants' willful failure to compensate its employees, including Plaintiffs and the members of the Collective Class, for all hours worked and at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours in a workweek, Defendants have violated, and continue to violate, the FLSA, 29 U.S.C. §§ 201, *et seq.*

174. The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

175. Due to the Defendants' FLSA violations, Plaintiffs, on behalf of themselves and the members of the Collective Class, are entitled to recover from Defendants: compensation for unpaid overtime wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees, costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF
### ERISA VIOLATIONS
**(On Behalf of the ERISA Class)**

176. Plaintiffs, on behalf of themselves and the ERISA Class, re-allege and incorporate by reference the paragraphs above as if they were set forth again herein.

177. Section 502(a)(1)(b) of ERISA [29 U.S.C. § 1132(a)(1)(B)] permits a participant to bring suit to recover benefits due to him or her under the terms of a

plan subject to ERISA, to enforce his or her rights under such a plan, or to clarify his or fights to future benefits under the terms of such a plan.

178. Defendants have improperly withheld from Plaintiffs, and members of the ERISA Class, vested benefits which they are entitled to under the terms of Defendants 401K plan by Defendants' improper characterization of Plaintiffs and members the ERISA Class as independent contractors.

179. Section 502(a)(3) of ERISA [29 U.S.C. § 1132(a)(3)] permits a participant to bring suit to enjoin any act or practice that violates any provision of ERISA or the terms of a plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provision of ERISA.

180. By excluding Plaintiffs and members of the ERISA Class by mischaracterizing them as independent contracts instead of employees, Defendants have engaged in acts or practices that violate ERISA and require redress by appropriate legal and equitable relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and/or on behalf of themselves and all other similarly situated members of the Classes respectfully request that this Court grant the following relief:

A.    Designation of this action as a collective action on behalf of the Collective Class, and prompt issuance of notice pursuant to 29 U.S.C. § 216(b), apprising them of the pendency of this action and permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b);

B.    Designation of the action as a class action under Fed. R. Civ. P. 23 on behalf of the ERISA Class;

C.    A declaratory judgment that the practices complained of herein are unlawful under the FLSA and ERISA;

D.    An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

E.    An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from taking any retaliatory actions against Plaintiffs and the Classes;

F.    An award of unpaid overtime compensation to Plaintiffs and members of the Collective Class;

G.    An award of liquidated damages to Plaintiffs and members of the Collective Class;

H.    An award of additional damages to Plaintiffs and members of the ERISA Class related to their unlawful exclusion from Defendants' 401K plan and other benefits of employment;

I.    An award of prejudgment and post-judgment interest to Plaintiffs and members of the Classes;

J.    An award of costs and expenses of this action together with reasonable attorneys' to Plaintiffs and members of the Classes; and

K.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

Dated:  March 6, 2017                    Respectfully submitted,

**ROBERT W. KILLORIN,**
**ATTORNEY AT LAW**


By:    s/ Robert W. Killorin
**ROBERT W. KILLORIN**
Ga. Bar. No. 417775
5587 Benton Woods Drive
Atlanta, GA 30342
Telephone: (404) 847-0617

Email: rwk@bellsouth.net

**FARUQI & FARUQI, LLP**
Innessa S. Melamed
685 Third Ave., 26th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: imelamed@faruqilaw.com
*Pending pro hac vice.*

***Attorneys for the Plaintiffs***